Mark E. Griffin, OSB #761528
Griffin & McCandlish
1631 NE Broadway, Suite 721
Portland, OR 97232
    Email: mark@markgriffin.com

William D. Brandt, OSB #720366
Attorney at Law
495 State Street, Suite 500B
Salem, OR 97301
    Phone: 503-485-4168
    Email: bill@brandtlawoffices.com

        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LIONESS HOLDINGS, LLC,<br><br>                    Plaintiff,<br>         v.<br><br>SENTINEL INSURANCE COMPANY, LTD., a Connecticut Insurance Company<br><br>                    Defendant. | Civil No. 3:17-cv-01238-JE<br><br>PLAINTIFF'S TRIAL MEMORANDUM |

## NATURE OF CASE

This is an action by plaintiff ("Lioness") against its insurer, Sentinel

Insurance Company, Ltd. ("defendant" or "Sentinel"), to recover on losses incurred

by Lioness. The insurance policy issued to Lioness provides coverage for those losses but Sentinel has failed and refused to provide indemnity owed under the policy.

## PARTIES

LIONESS HOLDINGS, LLC, ("Lioness") is an Oregon limited liability company with its principal place of business in Portland, Oregon. Lioness owns and operates a number of tanning salons in the Portland metropolitan area.

SENTINEL INSURANCE COMPANY, LLC, is a Connecticut insurance company with its principal place of business in Hartford, Connecticut. Sentinel is affiliated with THE HARTFORD FINANCIAL SERVICES CORPORATION, INC. ("Hartford")

## COURSE OF PROCEEDINGS/PLEADINGS

Except for the deposition of Carrie Still, discovery is closed.

This is a simple case by and insured, Lioness, against its insurer, Sentinel to recover on losses incurred by Lioness. The insurance policy issued to Lioness provides coverage for those losses but Sentinel has failed and refused to provide indemnity owed under the policy. Pursuant to the policy, Sentinel insured Lioness' property and agreed to pay for certain losses, including but not limited to damage to real and personal property, loss of business, and loss of business income.

*Plaintiff's claim:* Lioness suffered losses to 10 of its salons in late September

2016. Those claims fall within the coverage of Sentinel's policies. Pursuant to the terms of the policy Lioness sought payment from Sentinel for its damages. Over 10 months after Lioness reported the losses, Sentinel had failed to affirm or deny coverage; failed to promptly and reasonably conduct an investigation of the claims; and did not attempt to promptly and equitably settle the claims. Lioness is suing for the amount due under the policy, i.e., the value of the stolen and/or damaged equipment and continuing normal operating expenses. Those amounts are shown below in "Damages/Indemnity." Lioness also seeks attorney fees pursuant to ORS 742.061.

*Sentinel's defenses*: Sentinel has alleged the following partial defenses: Lioness has failed to cooperate in the investigation; Lioness entrusted the property to Ryan Reeves, the perpetrator of the theft and destruction; the damage to equipment at 10 separate salons on 3 different days was a "single occurrence;" plaintiff intentionally concealed a material fact about the claim; Lioness is not entitled to replacement costs because the property was not replaced; and Lioness did not have an insurable interest in the property.

## LENGTH OF TRIAL

The parties estimate that the trial will take 5 days.

## ADR

The parties have engaged in mediation.

## WITNESSES

Plaintiff anticipates calling twelve (12) witnesses and has filed a Witness List under separate cover.

## EXHIBITS

Plaintiff anticipates introducing 70 Exhibits and has filed an Exhibit List under separate cover.

## STATEMENT OF FACTS

Lioness Holdings, LLC, ("Lioness") is a Wyoming Limited Liability Company with its principal place of business in Oregon. Lioness owned and operated over 20 tanning salons in the Portland metropolitan area. From 2011 to 2016, consistent with its overall business plan, Lioness' business grew both through the addition of salons in new locations and by purchasing pre-existing salons.

During 2016, Lioness was insured through defendant Sentinel Insurance Company ("Sentinel"), a division of Hartford Insurance. At all times material to this case, Sentinel covered Lioness through its policy known as the Spectrum Business Owner's Policy and an Endorsement known as the Stretch policy. The Endorsement provided different and additional insurance protection to Lioness. Lioness purchased coverage for each salon as the salon was purchased, and paid separate premiums for each

salon. Each salon had a separate declaration page.

During the late night of September 24 and early morning of September 25, 2016, nine Lioness salons sustained damage as a result of theft and destruction of equipment. After closing on September 28, 2016, a tenth store was subject to theft and equipment destruction. Based upon the type of damage and theft that had occurred, it appeared that the crimes were not random but were designed to damage the Lioness business system. Specific expensive equipment that generated substantial income was targeted. That equipment was irreplaceable or to a large extent irreparable.

Lioness suspected that Ryan Reeves had orchestrated the crimes. Reeves was a disgruntled franchisee who had lost his franchise to Lioness, had threatened to destroy Lioness and had threatened the life of Lioness' manager, Peter Lamka. Reeves also had been an independent contractor who had provided training, design and construction services to Lioness. By September 2016, Lioness had severed ties with Reeves. Lioness told numerous police agencies, as well as Sentinel, that it suspected that Reeves was the mastermind behind the crimes. Reeves has not been charged with any of the crimes for the events in September 2016. Sentinel has taken no action against Reeves.

Lioness immediately reported the losses to Sentinel, first through

Chris Green, an independent insurance agent, and then directly to Sentinel. Green immediately reported the Loss to Sentinel. Lioness responded to requests for information, corresponded with adjusters and made employees and independent contractors available to Sentinel for interview. Among the independent contractors who worked with Lioness to provide information about the losses to Sentinel was Joseph Alan, who functioned as a CFO for Lioness. Lioness also advised Sentinel that Matthew Green-Hite was Lioness' accountant. Lioness gave Sentinel access to Green-Hite, signed waivers so that Sentinel could obtain information from 3rd parties, and otherwise cooperated in the investigation.

Within 10 days of the crimes, in addition to numerous emails and correspondence with Sentinel and the submission of numerous documents that Sentinel had requested, Lioness also worked with an outside adjuster, Gordon Nadel, to catalogue the damage to each salon. Over a one week period, Peter Lamka visited each salon with Nadel. Nadel photographed each piece of equipment that was damaged. Lamka told him the history and uses of the equipment, gave Nadel their values, and explained the tanning industry and difficulty in replacing or repairing the equipment.

In order to stay afloat, Lioness triaged equipment. Lioness moved equipment from less productive salons that had not been subject to the

crimes to the 10 salons that had sustained damage. Lioness also cannibalized equipment that was in use at lower-producing salons and unused equipment that was in Lioness' warehouse. Because replacement parts were so hard to get, Lioness purchased and stockpiled used equipment when if became available. Lioness also searched for replacement equipment and parts in the retail and wholesale markets. Lioness was forced to "rob Peter to pay Paul" in order to survive. The strategy, however, ultimately lead to an overall decline in revenues to the Lioness system because Sentinel did not meet its obligations to pay for the coverage that Lioness had purchased.

Lioness quickly became concerned that Sentinel was not conducting a reasonable investigation. There were multiple adjusters assigned to the claims in the weeks immediately after the crimes; excuses that adjusters were on leave; and multiple requests for documents and information that Lioness already had provided. Lioness complained to Sentinel that its failure to complete the investigation and to pay for losses was impeding Lioness' ability to survive

## DAMAGES/INDEMNITY

The amount due under the policy is in two components:  the value of the

stolen and/or damaged equipment and continuing normal operating expenses.

Such approximate amounts due for damage or theft to the equipment for each salon

is as follows:

| | |
|---|---|
| West Hills | $48,400 |
| Hollywood | $62,900 |
| Clackamas | $47,500 |
| Bridgeport | $94,200 |
| Wilsonville | $6,100 |
| Peterkort | $74,500 |
| Kruse Meadows | $30,100 |
| Happy Valley | $33,000 |
| West Linn | $39,100 |
| Tanasbourne | $31,500 |

The second component is "business income" as defined by the

Policy at page 00089 operating expenses.

> "(4) Business Income means:
> (a) Net Income (Net Profit or Loss before income taxes) that
> would have been earned or incurred if no direct physical loss or
> physical damage had occurred; and
> (b) Continuing normal operating expenses incurred, including
> payroll."

While defendant moved to dismiss claims based upon loss of net income,

defendant did not move for summary judgment on the second component of the business income, i.e., the failure to pay operating expenses. The court granted the motion as to net income but, because the issue of operating expenses had not been raised by defendant, was silent as to indemnity for normal operating expenses.  For the purposes of trial, plaintiff will simplify the calculation of "continuing normal operating expenses" to only two liabilities incurred during the period between the dates of the losses and the date of the sale of the business:  payment of real estate leases and payroll.  The ending date is appropriate because the evidence will show that plaintiff never recovered from the 10 incidents in late September 2016. Operating expenses are payable during the suspension of the business for up to twelve months.  Suspension means "the partial slowdown or complete cessation of your business activities."  Id.

## LEGAL ISSUES

1.  <u>Entrustment</u>. This defense fails because there is no evidence of entrustment of the property to Reeves or others on September 24, 25, and 28, 2016. The Exclusion states:  "We will not pay for physical loss or physical damage caused by or resulting from…Dishonest or criminal act by …anyone to whom you entrust the property."   Policy 00095-96.[1]

---

[1]   The policy, as produced by Sentinel in discovery, is attached to the Declaration of FJ

The policy unambiguously uses the verb "entrust" in present tense.  See, e.g., To v. State Farm, 319 Or 93, 97, 873 P2d 1072, 1074 (1994)(affirming Court of Appeals decision that because  "…[ORS 742.504(2)(g)]  uses the present tense 'having a claim,' not the past perfect, 'having had a claim,' * * * only the testimony of someone 'having a claim' at the time the testimony is offered is insufficient to corroborate the facts of a phantom vehicle accident.")  Here, the policy uses the present tense "entrust" not the past tense "entrusted."  Thus, unless the entrustment existed on the dates of the losses, the Exclusion does not apply.  The fact that Lioness may have entrusted the property to someone before the dates of the losses is not sufficient.  Tellingly, Sentinel's citations confirm this interpretation.  In each case,  the perpetrator either was employed by the insured or was an independent contractor who was performing services for the insured at the time of the loss.

The Exclusion also does not apply because Lioness did not "entrust the property" to Reeves.   Truck Insurance Exchange v. Bill Olinger Mercury, Inc., 262 Or 8, 495 P2d 1201 (1972), defeats Sentinel's defense.  In Olinger the Supreme Court affirmed a factual determination of entrustment because cars were stolen from defendant's lot during business hours by an employee who "[was] given responsibility for the keys and for watching over and handling [his]

---

Maloney as Exhibit _____.

employer's merchandise while it was being sold." Id, 262 Or 15-16, 495 P2d 1205.

The Court stated:

> "'Entrust,' as defined by Webster's New International Dictionary 855
> (2d ed 1961), is '* * * to commit or surrender (something) to another
> with a certain confidence regarding his care, use, or disposal of it; as,
> to Entrust a servant with one's goods, * * *.' For the use of the same
> definition in construing an identical policy provision, See Pacific
> Indemnity Co. v. Harrison, 277 S.W.2d 256, 257, 261
> (Tex.Civ.App.1955). Also see State v. Ugland, 48 N.D. 841, 187
> N.W. 237, 239 (1922) and cases cited therein. 'Entrust' is a term that is
> also particularly applicable to the relationship of master and servant.
> Id., 262 Or 15, 495 P2d 1204.

The facts in Olinger are distinguishable from those in this case. Reeves was
not an employee: the master servant relationship did not exist. The theft did not
occur during business hours. On the dates of the loss, Reeves was not entrusted
with the care, use, or disposal of the tanning equipment. Indeed, that had never
been his function as a sales trainer or remodeling contractor.

By its citation to Havas v. Carter, 85 Nev. 132,  451 P.2d 711 (1969), at 262
Or. 15, 495 P2d 1205, fn. 1, the Court in Olinger recognized that such distinctions
defeat the entrustment defense. The Havas Court held that there was no evidence
to support the entrustment exclusion in facts similar to those in the present case:

> The relevant facts are these: Havas closed his used car lot at 11
> o'clock on the evening of April 13, 1965. When he returned the next
> morning to reopen, one 1962 Cadillac was missing along with the
> keys to the car which had been kept in the used car lot office. The car

had been on the lot the night before at closing time. Also missing was one Paul Merritt, car salesman, who occupied an apartment in another building on the lot. Merritt has not been heard from since, nor has the automobile been located. <u>There is no evidence in the record to suggest that the automobile was entrusted to employee Merritt during the night when the lot was closed.</u> (Emphasis added).

Here, Lioness closed its salons as scheduled on the evenings prior to the losses. Cite When the salons were opened the next morning, equipment was damaged and product was missing. Reeves, for all practical purposes, "has not been heard from since." It is indisputable that the equipment had been damaged and the product had been stolen and not recovered. "There is no evidence in the record to suggest that the [tanning equipment] was entrusted to [Reeves] during the night[s] when the [salons] were closed." The entrustment Exclusion does not apply.

2. Insurable Interest. There is no dispute that equipment and product was stolen and/or damaged at 10 Lioness salons. There also is no dispute that at the time of the losses some of this property was subject to capital leases by Lioness but that Lioness held both title and the right to possession of most of the property and all of the product. Thus, Lioness has an "insurable interest" in the property other than through coverage for "property of others."

3. Single Occurrence. The Eleventh Affirmative Defense asserts that coverage is limited to $10,000 for "any one occurrence; the Twelfth

Affirmative Defense asserts that coverage is limited to $20,000 for "any one occurrence." Sentinel has incorrectly aggregated losses for all 10 salons by misinterpreting the phrase "any one occurrence."

There is no definition of "occurrence" in the policy. Occurrence is defined as:

> "**1**. Something that takes place usu unexpectedly and without design <a startling ~> **2**. The action or process of happening <the repreated ~ of petty theft in that locker room> **syn** OCCURRENCE, EVENT INCIDENT, EPISODE, CIRCUMSTANCE, HAPPENING *shared meaning element:* something that happens to take place."
> Webster's New Collegiate Dictionary (1981), p. 788

There is no dispute that equipment was stolen or damaged and product was stolen at 10 different salons, in 10 different events, on 3 different days, in 3 different political jurisdictions. For the purposes of prosecution in 3 different Counties, each event would be considered a separate crime. This series of crimes against Lioness was not "one occurrence" and the limitations do not apply.

Sentinel recognizes that each salon is separate for property coverage purposes. The insurance policy contains separate declaration sheets for each of the 10 salons. Sentinel treated each salon as a separate location; charged different premiums for each salon; and underwrote each salon separately. Id. As each salon was purchased or opened, Sentinel provided coverage for that salon upon payment of additional premiums by Lioness. If a salon came on line mid-year, Sentinel

apportioned the annual premium.

When Lioness was damaged by a series of thefts from different salons over a 3 day period in late November 2016, Sentinel admitted that these incidents were not a single occurrence

Sentinel admits that "the term 'occurrence' is not defined in the applicable Special Property Coverage Form" but argues that this Court should adopt one of a variety of definitions for occurrence that are used for  inapplicable coverage or exclusions.   Neither law nor logic support such contractual interpretation.

Citing the policy's Earth Movement Exclusion, the Forgery Exclusion, the Counterfeit Exclusion, and the Employee Dishonesty Exclusion, all of which use or define the term "occurrence" differently, Sentinel argues that the "policy evinces its intent to apply a single occurrence to a single damage causing event."  To the contrary, the fact that the policy does not define "occurrence" in the Special Property Coverage Form is proof that the parties did not intend to limit the definition of "occurrence" as it did in other parts of the policy.

The Earth Movement Exclusion states: "all volcanic eruptions that occur with any 168 hours period will constitute a single occurrence."  If the policy intended this definition for Special Property Coverage, the Form would state:  "all thefts and destruction that occur with any 168 hours period of the first break-in will

constitute a single occurrence." It does not.

The Forgery Exception defines occurrence as "all loss caused by any person or in which that person is involved." If the policy intended this definition for Special Property Coverage, the Form would state: "all loss caused by any person or in which that person is involved." It does not.

The Counterfeit Exception defines occurrence as an "act or series of acts involving one or more persons." If the policy intended this definition for Special Property Coverage, the Form would state: "act or series of acts involving one or more persons." It does not.

The Employee Dishonesty Exception defines occurrence as "all loss caused by or involving one or more employees whether the result of a single act or a series of acts." If the policy intended this definition for Special Property Coverage, the Form would state: "all loss caused by or involving one or more employees whether the result of a single act or a series of acts." It does not.

4. Failure to cooperate. In order to prevail on this affirmative defense Sentinel must prove: (1) the insurer diligently sought the insured's cooperation, (2) the insured willfully failed to cooperate, and (3) the insured's failure to cooperate prejudiced the insurer. *Assurance Co. of Am. v. MDF Framing, Inc.,* 338 Fed Appx 625, 2009 WL 2013512 (9th Cir 2009). Sentinel fails on all three of

these elements.  First, Sentinel's investigation was anything but diligent.  It was marred by delay, duplicitousness and negligence, at best. Second, there is no evidence that Lioness failed to cooperate.  To the contrary, Lioness worked diligently to provide information to Sentinel; immediately submitted information relating to the losses; accompanied Sentinel's investigator to photograph and inventory damaged equipment; and submitted to two examinations under oath. cite Finally, there is no evidence that any alleged failure to cooperate prejudiced Sentinel.

The policy describes Lioness' duties in the event of loss or damage.

**3. Duties in the Event of Loss or Damage**
You must see that the following are done in the event of loss of or damage to Covered Property:…
**e.**  At our request, give us complete inventories of the damaged property. Include quantities, costs, values and amount of loss claimed...
**g**.  If requested, permit us to question you under oath at such times as may be reasonably required about any matte relating to this insurance or your claim, including your books and records.  In such event, your answers must be signed…
**i**.  Cooperate with us in the investigation or settlement of the claim. Policy 000099.

The evidence is overwhelming that Lioness met these obligations.

*Lioness provided complete inventories of the damaged property*.

As soon as Sentinel appointed an investigator, the manager of Lioness accompanied him to each salon, described the damage and the value and

importance of each piece of equipment, explained the background and structure of the business, and completed a photographic inventory of all damaged equipment. Cite and investigative reports. Lioness also submitted detailed information as to the losses for each location.  Sentinel's internal memoranda confirm that Lioness met this contractual obligation.

*Lioness submitted to questioning under oath.*

Peter Lamka, the manager for Lioness, submitted to examination under oath on two occasions.  The first was at the request of Carrie Still, a Special Investigations Unit investigator, on October 13, 2016.  Mr. Lamka also made Zach Flenniken and Joseph Alan available for questioning by Ms. Still at that session. Cite  Mr. Flenniken sat through the entire session and answered questions throughout.   On June 12, 2017, Mr. Lamka voluntarily attended a second lengthy EUO at the offices of Smith Freed.  There can be no dispute that Lioness performed its contractual obligation to submit to questioning under oath.

*Lioness cooperated with Sentinel in the investigation of the claim*

Sentinel cites two instances to support its argument that Lioness failed to cooperate: Lioness' request that Sentinel sign a non-disclosure agreement ("NDA") in order to review the due diligence file relating to the proposed sale of Lioness and Lioness' redaction of contact information in a phone message relating to that proposed sale.  Neither event constitutes a failure to cooperate by Lioness.  To the

contrary, Sentinel's refusal to sign the NDA and insistence that Lioness breach its contractual obligations to third parties by revealing confidential information is evidence that Sentinel was not conducting its so called investigation in good faith.

Sentinel's reliance on Safeco Ins. Co v. Masood, 264 OrApp 173, 330 P3d 61 (2014), is misplaced. In Masood, the Court of Appeals interpreted specific language in an insurance policy which significantly differs from the language in the Sentinel policy. The insured in Masood had a contractual obligation to "f. as often as we reasonably require: ... "(2) provide us with records and documents we request and permit us to make copies." Lacking this contract language in the policy here, Sentinel cites to the generalized language, of section **3.a**, i.e, the duty to "Cooperate with us in the investigation…". Lioness's actions with respect to its proposed purchase do not violate this contract term. Lioness' did not refuse to release the information requested. Lioness merely made the reasonable request that Sentinel sign the NDA before Lioness disclosed confidential information that Lioness had a contractual obligation to protect.

Lioness's conduct differs from the conduct of the insured in Masood. Safeco had asked the insured, Masood to disclose information about his family expenses and expenditures. Here, Sentinel asked Lioness to disclose financial

information that was deemed confidential by a third party.[2] Lioness had a

contractual obligation to that third party to maintain the confidentiality of the

information. Lioness was faced with a dilemna. On the one hand, if Lioness

disclosed the information without obtaining an NDA from Sentinel, it would

violate its obligation to the purchaser and risk the multi-million dollar sale. On the

other, if Lioness refused to produce the information without obtaining an NDA,

Lioness risked the claim by Sentinel that Lioness had not cooperated in the

investigation. Lioness' decision to insist upon the signing of the NDA and in

redacting information were justified under the terms of the policy, were reasonable,

and were made in good faith. Cite. These solutions satisfied both Lioness'

obligation to the third party and it's duty to provide the information to Sentinel.

Sentinel's take it or leave approach by its refusal to sign the NDA was not justified

by the terms of the contract, was not reasonable, and was not done in good faith.

Cite  Sentinel intransigence is consistent with its attempt to create an artificial issue

in order to justify its delay in the investigation and failure to provide coverage.

Sentinel's conduct is a breach of its duty to act in good faith. ORS

746.230(1)(b)(c) and (d).

---

[2]  Lioness redacted the contact information equally was protected by the confidentiality
agreement. Lioness did, in fact, produce what Sentinel had requested: proof that there were
on-going negotiations for the sale of the business.

## 5.  Sentinel's good faith duties

All parties to a contract have a duty to act in good faith.  In Oregon, an insurance company violates its' duty of good faith and fair dealing by:

Failing to acknowledge and act promptly upon communications relating to claims;

Failing to adopt and implement reasonable standards for the prompt investigation of claims;

Failing to affirm or deny coverage of claims within a reasonable time after completed proof of loss statements have been submitted;

Not attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear;

Compelling claimants to initiate litigation to recover amounts due by offering substantially less than amounts ultimately recovered in actions brought by such claimants;

Failing to promptly settle claims under one coverage of a policy where liability has become reasonably clear in order to influence settlements under other coverages of the policy; or

Failing to promptly provide the proper explanation of the basis relied on in the insurance policy in relation to the facts or applicable law for the denial of a claim.

6.  Replacement costs.  As Sentinel well knows, Lioness did not have "replacement cost" coverage.  *See* Higgins v. Ins. Co of N. America, 256 Or 151, 165, 469 P2d 766 (1970) for description of such coverage.  Rather, payment for damage on a replacement cost basis was one of 4 options under the policy:

> **5.  Loss Payment**
> In the event of physical loss or physical damage covered by this policy:
> **a**.  At our option we will either:
>     (1) Pay the value of physically lost or physically damaged property, as describe in **d** below;
>     (2) Pay the cost of repairing or replacing the physically lost or physically damaged property, plus any reduction in value of repaired items;
>     (3) Take all or any part of the property  at an agreed or appraised value; or
>     (4) Repair, rebuild or replace the property with other property of like kind and quality.
> **b**. We will give notice of our intentions within 30 days after we receive the sworn statement of loss.  (Emphasis added)
> Policy 000099

That there are four options for payment negates Sentinel's argument that Lioness had only replacement cost insurance.

Further, Sentinel is in no position to invoke the payment limitations in subsections **5.d(1)(b)** and **(c)** of the **Loss Payment** terms of the policy. Sentinel violated it duties by  failing to give notice to Lioness as to which payment option Sentinel would select, as required by subsection **5.b**. Sentinel did not supply Lioness with the necessary forms for completion of the sworn loss statement as Sentinel was required to do by subsection **3.h.**  Subsection **3** states in relevant part:

### 3. Duties in the Event of Loss

**h**. Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. <u>We will supply you with the necessary forms.</u> (Emphasis added).
Policy 000099.

Sentinel's failure to comply with the Loss Payment provisions is consistent with its strategy to delay payment for damages that are covered by the policy. Sentinel's misdeeds cannot provide a basis for denying coverage.

7. <u>Business Income.</u> The policy states that Sentinel will pay an additional amount for business income.

> "(4) Business Income means:
> (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and
> (b) Continuing normal operating expenses incurred, including payroll."

While it may be tempting to follow the <u>HTI Holdings v. Hartford Insurance Co</u>. case, it is neither necessary nor appropriate for this court to do so. The <u>Amerigraphics, Inc. v. Mercury Cas. Ins. Co.</u>, 182 Cal. App. 4th 1538, 1552, 107 Cal. Rptr. 3d 307 (2010) is better reasoned and is more consistent with Oregon law. The <u>HTI</u> court recognized the ambiguity in the language of the policy, particularly relating to the word "and." That ambiguity did not disappear by the court's reference to other ambiguous terms.

"**and**.  The simplest looking words are often the most complicated, and and is no exception. The normal function of this connection conjunction is, of course, to join sentence elements of the same kind: e.g. *Dido and Aeneas; first and foremost*…It can imply progression (*faster and faster*), causation (*misbehave and you'll not get your pocket money*), great duration (*she ran and ran*), a large number or a great quantity (*miles and miles, piles and piles*) and addition (*four and four are eight*)."
Fowler's  Model English Usage, 3rd Ed, Burchfield (1996), p. 52.


The HTI  court's choosing of the mathematical implication did not make the

language any less ambiguous and was not consistent with the context of this

*additional coverage* as Amerigraphics explains.   The HTI interpretation also is

inconsistent with the word "continuing."

"Continue: 1. to mainitain without interruption a condition, course or action 2. To remain in existence: ENDURE 3. to remain in place or condition: STAY 4. To resume an activity after an interruption…"
"Continuing" implies "perservering, carrying on, progressing, CONSTANT;REGULAR."
Webster's New World Dictionary and Thesaurus, 2nd Ed., (2002), p. 135.

To measure "continuing operating expenses" after the fact defeats the

purpose of the insurance policy and Oregon law.  HTI also ignores business reality

by denying coverage for start up businesses which would expect not to make profit

quickly after opening and businesses focused on growth which, like Lioness,

would not show profit because they chose to forgo immediate profit in favor of

plowing excess revenues into expansion.  Either type of business might experience

losses and purchase interruption insurance. Such insurance would protect these

types of businesses from additional Net Losses but, under the HTI interpretation, could not recover for the difference between expected losses and those losses that were the result of the delay or denial of this additional insurance.

HTI rewards insurers for delaying or denying an insured the opportunity to carry on, to endure, and to minimize the injury sustained by a covered loss. HTI encourages insurer misconduct. HTI is inconsistent with Oregon insurance law that forbids insurers from not attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear. ORS 746.230(1).

## VOIR DIRE, JURY INSTRUCTIONS and VERDICT

Plaintiff has filed Voir Dire Questions, Jury Instructions and a Proposed Verdict under separate cover.


Dated: June 27, 2018
       ____/s/ Mark E. Griffin _____
       Mark E. Griffin, OSB 76-152

       Griffin & McCandlish
       Of Attorneys for Plaintiff

       William D. Brandt
       Of Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2018, I served **Plaintiff's Trial Memorandum** on:

Francis J. Maloney III
Scott A. MacLaren,
Maloney Lauersdorf Reiner, P.C.,
1111 E Burnside St., Suite 300
Portland, Oregon 97214
E-mail: fjm@mlrlegalteam.com
E-mail: sam@mlrlegalteam.com

by the following indicated method or methods:

     by mailing a full, true, and correct copy thereof in a sealed, first-class postage-prepaid envelope, addressed to the attorney(s) and/or parties as shown above, the last-known office address of the attorney, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

X     by e-mailing a full, true, and correct copy thereof to the attorney(s) and/or parties as shown above, at the last known e-mail address of the person.

X     court ecf system

     DATED: June 27, 2018

                        /s/ Mark E. Griffin
                      MARK E. GRIFFIN, OSB #761528
                      Of Attorneys for Plaintiff